**DICKINSON WRIGHT PLLC**
JOHN P. DESMOND
Nevada Bar No. 5618
JUSTIN J. BUSTOS
Nevada Bar No. 10320
100 W. Liberty St., Ste. 940
Reno, NV 89501
775.343.7500
844.670.6009
Email: jdesmond@dickinsonwright.com
Email: jbustos@dickinsonwright.com

**HODGSON RUSS LLP**
Ryan K. Cummings (*will comply with LR IA 11-2 within 14 days*)
Benjamin M. Zuffranieri, Jr. (*will comply with LR IA 11-2 within 14 days*)
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
Telephone: 716.849.0349
Email: ryan_cummings@hodgsonruss.com
Email: bzuffran@hodgsonruss.com

*Attorneys for Karrena USA Inc. f/k/a Karrena LLC f/k/a Karrena International Chimney, LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| KARRENA USA INC. f/k/a KARRENA LLC and KARRENA INTERNATIONAL CHIMNEY, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>COBRA THERMOSOLAR PLANTS, INC.,<br><br>Defendant. | Case No.<br><br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Karrena USA Inc. f/k/a Karrena LLC and Karrena International Chimney, LLC ("Karrena"), by and through its counsel, Dickinson Wright, PLLC and Hodgson Russ LLP, alleges for its complaint:

## NATURE OF THE ACTION

1. This action arises out of work performed by Karrena on the Crescent Dunes Solar Energy Project in Tonopah, Nevada. Karrena was forced to incur extra costs and fees, and to perform extra work, as a result of defendant's improper design, instruction, and interference in the performance of Karrena's contract for the project.

## THE PARTIES AND JURISDICTION

2. Karrena is a Massachusetts corporation with its principal place of business at 1000 Market Street, Building 2, Portsmouth, New Hampshire 03801.

3. Karrena was formerly known as Karrena International Chimney LLC and then Karrena LLC.

4. Upon information and belief, Cobra Thermosolar Plants, Inc. ("Cobra") is a Delaware corporation with its principal place of business at 112 North Curry Street, Carson City, Nevada 89703. Upon information and belief, Cobra is a direct or indirect subsidiary of ACS Cobra, one of the indirect members of Tonopah Solar Energy, LLC.

5. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the value of the case, exclusive of interest and costs, exceeds $75,000, and involves citizens of different states, and involves a contract that expressly requires litigation in Nevada, pursuant to Nevada law.

6. This Court has personal jurisdiction over Cobra because it is a citizen of Nevada, has its principal place of business in Nevada, and the contract at issue was to be performed in Nevada.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because this is where the contract was to be performed.

### FACTUAL BACKGROUND

### The Project

8. The Project began in 2008 with the creation of Tonopah Solar Energy, LLC; the intent was to develop a 110 megawatt concentrated solar power project.

9. Upon information and belief, Tonopah Solar Energy, LLC was formed by SolarReserve LLC, Cobra Energy Investment LLC, and Banco Santander S.A.

10. Upon information and belief, Cobra Energy Investment LLC was owned, directly or indirectly, by ACS Cobra.

11. Upon information and belief, ACS Cobra was the Engineering design, Procurement, and Construction ("EPC") contractor for the Project.

12. In 2011, Tonopah Solar Energy, LLC received a $737 million U.S. Department of Energy loan guarantee to complete the Project.

13. By 2015, the plant began commercial operation and Tonopah Solar Energy, LLC entered into a twenty-five year power purchase agreement with the Nevada Energy to sell the energy produced by the plant.

14. In 2016, the plant was taken offline for eight months because of a leak in the molten salt tanks due to a design flaw.

15. The plant resumed operations in 2017, only to experience additional technical and performance issues in 2018, which lead to the Department of Energy declaring a default under the loan guarantee.

16. In 2019, the project experienced additional problems with the molten salt tanks, impacting the anticipated monthly output.

17. In 2019, Nevada Energy terminated its contract with Tonopah Solar Energy, LLC due to its performance failures; the U.S. Department of Energy took over the shuttered plant.

18. Tonopah Solar Energy, LLC declared Chapter 11 bankruptcy.

19. As part of the bankruptcy court's approved plan of reorganization for Tonopah Solar Energy, LLC in December 2020, the Department of Energy received $200 million and ACS Cobra received control of the plant.

### **The Cobra/Karrena Contract**

20. On January 9, 2020, Cobra and Karrena entered into a contract regarding a new foundation for the molten salt tanks on the project.  A true and correct copy of the base contract is attached as **Exhibit A** and incorporated herein.

21. Pursuant to the contract, Cobra was responsible for the design and execution procedures of the new foundation: "Design of the new foundation and execution procedure is provided by COBRA according with the drawings and technical specifications included in appendix 1 of this contract."  *Id.* at p. 2, § 2.

22. The contract specifically excluded from Karrena's scope of work the following:

   a. All aspects of Foundation Design, including reinforcement design.
   b. Engineering and drawings inc. PE stamp.

    c.    Removal of all demolished materials including concrete - Note to be removed by others providing a clear area within 100 yards of Exterior Tank Perimeter.

    d.    Supply of Carbon Steel air cooling pipes as detailed on drawing CDS - 10 - UWS - CDF -100 - 001

    e.    All refractory material (Hortix 1256 ZR - 7) - (Horlite 1300 V-G) - To be delivered to site.

    f.    All expanded clay Arlita as required - To be delivered to site.

    g.    All Carbon Steel required for the foundation construction (Steel Ring, Sliding Ring) - Ref drawing CDS - 04 sheet 4

    h.    (If required) - Fibers for Refractory Reinforcement.

    i.    All water required to Mix Refractory (Total volume required = 140,000 Gallons) to be made available adjacent to HST foundation - Water quality needs to be confirmed by Refralia - Anticipated to be (PH7) VENDOR will be responsible for take care of the water temperature and provide tanks. COBRA will just supply the volume of water required within the PH range required by Refralia.

*Id.*

23.    Under the terms of the contract, Cobra could request additional work from Karrena:

> If required by COBRA, supported with a contract extension, VENDOR will execute any of the following scope of work.
>
> **ERECTION OF FOUNDATION LOWER CONCRETE SLAB**, if requested by COBRA this will be done as the first step after mobilization. Lower concrete slab is defined in Appendix 1 of the contract. The execution of this optional scope will add 3 weeks to the contract schedule as per article 4 of this contract.
>
> **METAL FIBER REINFORCEMENT**, if requested by COBRA, VENDOR will add the inclusion of mixing in metal fibers into the volume of refractory specified by COBRA in the request. Metallic fibers supplied by COBRA. Estimated volume of metallic fibers to be added. This optional won't have any impact in the project schedule.

*Id.* at p. 4, § 2.3.

24. Included in Karrena's scope of work was the production of a Technical Dossier and a Quality Dossier. *Id.* at p. 4, § 2.1.

25. Karrena was to be paid $4,920,620.85 for the base contract work. *Id.* at p. 5, § 3.

26. The contract contemplated mobilization by January 27, 2020 and completion within 17 weeks if the optional work was not requested, or 20 weeks if it that work was required. *Id.* at p. 8, § 4.

27. The contract purported to incorporate by reference a number of other documents, including certain General Purchasing Conditions. *Id.* at p. 14, § 12.

28. While Karrena disagrees that it specifically consented to, and acknowledged the General Purchasing Conditions, or that those Conditions are internally consistent or clear such that they are enforceable, nonetheless, those conditions obligated Karrena to follow any "orders and instructions given by COBRA THERMOSOLAR PLANTS and its representatives at the site…." General Conditions § 5.7.

29. And according to those Conditions, Karrena could "only object to any Variation request when the Variation request will require the Contractor [Karrena] to infringe the law." General Conditions § 25.2.

30. Karrena was not permitted "to suspend work[] or revise [its] execution" even if it objected to the orders and/or instructions given by Cobra. General Conditions § 5.7.

31. Karrena was entitled to an extension of time to complete the contract if its work is delayed by Cobra's acts or omissions. General Conditions § 8.2.

**Karrena Performs and Cobra Interferes with its Work,
Delays its Work, and Directs it to Perform Additional Work**

32. Karrena performed the work required by the contract and in accordance with the Cobra design and execution procedures.

33. Throughout the project work, however, Cobra delayed and interfered with Karrena's work, added extra work that was not called for under the contract, unilaterally changed the design/erection/technical specifications, but has failed and refused to compensate Karrena for all the associated delays and extra work.

34. On April 22, 2020, Karrena submitted a Construction Change Request rev 02 to Cobra for $44,315.00.

35. The Change Request was based on Cobra's changes to the project design.

36. Cobra rejected the Change Request.

37. On May 22, 2020, Karrena submitted a Construction Change Request to Cobra for $40,435.

38. The Change Request was principally based on the need for Karrena to sieve the Artlita materials[1] provided by Cobra because those batches of Arlita did not have sufficient fines.

39. Cobra rejected the Change Request.

40. On June 24, 2020, Karrena submitted a Construction Change Request to Cobra for $911,084.64.

41. The primary basis for the Change Request was the additional time, effort, and costs Karrena incurred to compact the expanded clay Arlita, which was the product selected

---

[1] Arlita are small, clay balls, occasionally used in construction applications as aggregate in light-weight concrete.

and mandated for the foundation by Cobra, as reflected in Cobra's design documents, execution procedures, and technical specifications.

42. Cobra introduced new homogenization criteria and testing requirements during the construction of the project; homogeneity testing was required in 17 locations with an acceptable tolerance -0% +10%.

43. In addition, Cobra was responsible for providing the Arlita on site. The Arlita delivered was not consistent with the material properties described in the material data sheets, project drawings, and erection procedures provided by Cobra.

44. When requested by Karrena, Cobra and the Arlita manufacturer refused to provide information regarding the use of Arlita for a project of this type.

45. A Construction Change Request was submitted by Karrena on June 26, 2020 for $29,753.00

46. The Change Request addressed additional costs related to Cobra giving direct instructions to Karrena personnel to proceed in performing a work that was not call for in the contract.

47. Cobra rejected the Change Request on or about July 22, 2020.

48. A Construction Change Request was submitted by Karrena on March 18, 2021 for $255,387.81.

49. The Change Request addresses additional costs related to re-working certain vertical weld joints on the steel ring to accommodate, and as a result of, penetrant and radiograph testing done on those joints.

50. The testing criteria was changed, and increased the level of quality demanded by Cobra, after Karrena had signed the contract and had done the shop and field welding for those

joints. Cobra arranged for inspection and tests to be performed utilizing more stringent criteria than Karrena agreed to in the contract and without notification and/or agreement with Karrena regarding the type of the tests or the testing date.

51. The additional testing, manpower, and equipment cost Karrena $255,387.81.

52. Cobra rejected the Change Request.

53. A Construction Change Request was submitted on March 18, 2021 for $756,566.91.

54. This Change Request sought compensation for delays associated with Cobra's instruction to Karrena to pump Horlite[2] onto the lower slab.

55. The Horlite was required by Cobra's design, erection, and technical specification documents.

56. On the first day of pumping, Karrena notified Cobra that the pipes were clogging because Horlite was not suitable for pumping.

57. Cobra eventually approved an additive recommended by Karrena and approved by the refractory manufacturer to improve the flow ability of the Horlite, but Cobra did not order or deliver the additive to the site.

58. The additional time and materials Karrena was forced to incur and pay for as a result of Cobra's breach totaled $756,566.91.

59. Cobra rejected the Change Request.

60. On March 18, 2021, Karrena submitted a Construction Change Request in the amount of $82,543.75.

---

[2] Horlite is a concrete type product.

61. The Change Request is for costs associated with increased testing and associated manpower, that was not included in, or reasonably inferable from, the original design, erection, and technical specifications provided by Cobra.

62. Cobra rejected the Change Request.

63. On March 18, 2021, Karrena submitted a Construction Change Request in the amount of $102,540.60.

64. The Change Request is due to Cobra's decision to change the splices of the radial channels from riveted as reflected in Cobra's original design, execution, and technical specifications, to welded.

65. Cobra rejected the Change Request.

66. On March 22, 2021, Karrena submitted a Construction Change Request in the amount of $50,359.79.

67. The additional cost was due to Cobra's failure to timely supply an SS plate and when the plate was finally supplied, it was thicker than the specification.

68. Cobra rejected the Change Request.

69. Cobra's representatives were on site throughout the project; they were made aware of the delays, challenges, and deficiencies caused by Cobra's design documents, erection instructions, and technical specifications, in real time; and they were aware that Karrena expected to be compensated for the delays, extra labor, and extra costs associated with Cobra's breaches.

70. On April 14, 2021, Karrena issued its invoices for the balance of its contract totaling $617,849.38.

71. Cobra has failed to pay the invoices.

72. Cobra has received and retained the benefit of Karrena's work, but has not paid for it.

### FIRST CAUSE OF ACTION
### (Breach of Contract)

73. Karrena repeats and realleges the allegations contained in paragraphs 1 through 72 as is fully set forth here.

74. Karrena and Cobra entered into a contract dated January 3, 2020.

75. Karrena performed its obligations under the contract.

76. Cobra breached the contract by, among other things, providing Karrena with faulty design documents, and faulty technical specifications; directing Karrena to perform work in a specific manner that was neither called for in the contract, nor recommended or approved by the product manufacturers; and directing Karrena to perform additional work without paying for the additional work.

77. Cobra has been damaged as a result of Cobra's breaches in an amount to be determined at trial, but no less than $2,890,835.88, plus interest.

### SECOND CAUSE OF ACTION
### (Breach of Duty of Good Faith and Fair Dealing)

78. Karrena repeats and realleges the allegations contained in paragraphs 1 through 72 as is fully set forth here.

79. Karrena and Cobra entered into a contract dated January 3, 2020.

80. Karrena performed its obligations under the contract.

81. Cobra breached its implied duty of good-faith and fair dealing when it interfered with Karrena's work and refused to provide information regarding the Arlita and/or Horlite.

82. Cobra has been damaged as a result of Cobra's breaches in an amount to be determined at trial, but no less than $2,890,835.88, plus interest.

### THIRD CAUSE OF ACTION
**(Cardinal Change/Contract Abandonment)**

83. Karrena repeats and realleges the allegations contained in paragraphs 1 through 72 as if fully set forth here.

84. Karrena and Cobra entered into a contract dated January 3, 2020, under which Karrena agreed to provide certain work in return for a lump sum payment.

85. Cobra substantially, and materially, changed the scope of the contract.

86. Cobra's changes increased Karrena's contract costs by over 45%.

87. Despite Cobra's material changes to the contract, Karrena continued to perform the requested work with the understanding that it would be paid for the extra costs and work.

88. Cobra has received and retained the benefit of Karrena's work.

89. Cobra has failed and refused to pay the reasonable value of the extra costs and work Karrena incurred.

90. Cobra has been damaged in an amount to be determined at trial, but no less than $2,890,835.88 plus interest.

**WHEREFORE**, Karrena demands judgment as follows:

A. On its first cause of action, compensatory, special, and consequential damages;

B. On its second cause of action, compensatory, special, and consequential damages;

C. On its third cause of action, compensatory, special, and consequential damages;

D. Attorneys' fees, costs, and interest; and

E. Such other and further relief as the Court deems necessary and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Karrena demands a trial by jury of all issues so triable.

Dated: July 7, 2021

**DICKINSON WRIGHT PLLC**

BY: /s/ Justin J. Bustos
John P. Desmond
Nevada Bar No. 5618
Justin J. Bustos
Nevada Bar No. 10320
100 West Liberty Street, Suite 940
Reno, Nevada 89501
Telephone: 775.343.7505
Email: jdesmond@dickinsonwright.com
Email: jbustos@dickinsonwright.com

**HODGSON RUSS LLP**
Ryan K. Cummings
(*will comply with LR IA 11-2 within 14 days*)
Benjamin M. Zuffranieri, Jr.
(*will comply with LR IA 11-2 within 14 days*)
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
Telephone: 716.849.0349
Email: ryan_cummings@hodgsonruss.com
Email: bzuffran@hodgsonruss.com

*Attorneys for Karrena USA Inc. f/k/a Karrena LLC f/k/a Karrena International Chimney, LLC*

**EXHIBIT TABLE**

| Exhibit | Description | Page(s)[i] |
|---|---|---|
| A | Base Contract | 14 |

---

[i] Page count is not inclusive of exhibit slip sheet.